AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

FILED

APR 2 0 2017

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*
the white Samsung Galaxy S6 mobile phone, bearing
MEID number DEC 256691573501336212

)
)
)
)
)
)

Case No.  1:17sw 204

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
the white Samsung Galaxy S6 mobile phone, bearing MEID number DEC 256691573501336212, further described in Attachment A, and

located in the _____ Eastern _____ District of _____ Virginia _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1951 and 924(c) | obstructing, delaying, and affecting commerce by robbery; using, carrying, and brandishing a firearm during and in relation to crimes of violence; and conspiracy |

The application is based on these facts:

See attached affidavit of Joseph Paul Rogers, FBI Special Agent

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

Rebeca H. Bellows

_____
*Applicant's signature*

Joseph Paul Rogers, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 04/20/2017 _____

City and state:   Alexandria, Virginia

_____ /s/ _____
Michael S. Nachmanoff
United States Magistrate Judge
*Judge's signature*

The Honorable Michael S. Nachmanoff, US Magistrate Judge
*Printed name and title*

## ATTACHMENT A

The property to be searched is the white Samsung Galaxy S6 mobile phone, bearing MEID number DEC 256691573501336212, hereinafter referred to as "the Device." The Device is currently located at 9325 Discovery Boulevard, Manassas, Virginia, 20109.

## ATTACHMENT B

1.     All information and records on the Device described in Attachment A that may be evidence of violations of 18 U.S.C. §§ 1951(a), 924(c), and 2 (robbery affecting interstate commerce, conspiracy to do the same, and using, carrying, and brandishing a firearm during and in relation to a crime of violence), including, but not limited to:

>       communications or information reflecting the planning or execution of a robbery of a commercial establishment;

>       photographs or videos of criminal associates;

>       photographs or videos of cash;

>       photographs or videos of firearms or other weapons;

>       photographs or videos of masks and other clothing items worn during robberies, including dark pants with marking above right knee, dark-colored coat with fur-lined hood, gray hooded sweatshirts, blue Helly Hansen jacket, dark-colored hooded sweatshirt with Nike logo on front, and dark gray hooded jacket;

>       internet searches of commercial establishments and/or their locations;

>       record of use of mapping applications for directions to robbery locations;

>       address/phone books or contact information that reflect names of potential criminal associates;

>       call logs;

>       bills and invoices, including purchases of materials that are likely used to commit a robbery affecting interstate commerce;

>       records, photographs, videos, or communications relating to the purchase or possession of firearms;

>       records of storage facilities owned or rented;

>       safe deposit records; and

>       cellular and landline telephone statements and records.

2.     Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      Records evidencing the use of the Internet Protocol addresses, including:

       a.      records of Internet Protocol addresses used;

       b.      records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4.      All GPS information on the subject phone.

       As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form. Such records and information include the content of communications, text messages, voice mail messages, photographs, images, and video.

2

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

F I L E D
APR 2 0 2017
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE MATTER OF THE SEARCH          )
OF THE WHITE SAMSUNG                 )       Case No. 1:17SW 204
GALAXY S6 MOBILE PHONE,              )
BEARING MEID NUMBER                  )
DEC 256691573501336212               )

**Affidavit in Support of an Application Under
Rule 41 For a Warrant to Search and Seize**

I, Joseph Paul Rogers, a Special Agent with the Federal Bureau of Investigation ("FBI"),

being duly sworn, depose and state the following:

**Introduction and Agent Background**

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have

been so employed since January 2015. As such, I am an "investigative or law enforcement

officer of the United States" within the meaning of Section 2510(7) of Title 18, United States

Code, that is, an officer of the United States empowered by law to conduct investigations of and

to make arrests for offenses enumerated in 18 U.S.C. §§ 1951 and 924(c).

2.      During my employment as an FBI Special Agent, I have been assigned to

investigate violations of federal law, including robberies of banks, credit unions, and commercial

establishments. I have training and experience in the area of robbery investigations, cellular

telephone analysis, interview and interrogation, and evidence recovery. I am currently assigned

to the Washington Field Office, Northern Virginia Violent Crimes Task Force.

3.      This affidavit is submitted in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a search warrant authorizing the examination of an

electronic device that is currently in the possession of law enforcement, and the extraction from

that property of electronically stored information described in Attachment B. The warrant seeks

to obtain further evidence that subjects described herein have committed robberies affecting

interstate commerce; have used, carried, and brandished firearms during and in relation to crimes

of violence; and have conspired to do the same, all in violation of 18 U.S.C. §§ 1951(a) and

924(c).

4.     The factual information supplied in this affidavit is based upon my investigation

and information provided to me orally and in written form by other law enforcement officers.

All observations not personally made by me were relayed to me by the individuals who made

them or are based on my review of reports, documents, and physical evidence obtained during

the course of this investigation.  This affidavit contains information necessary to support

probable cause.  It is not intended to include each and every fact and matter observed by me or

known to the United States.

## Identification of the Device to Be Examined

5.     The property to be searched is described in Attachment A and hereinafter referred

to as "the Device."  The Device is currently located at 9325 Discovery Boulevard, Manassas,

Virginia, 20109, within the Eastern District of Virginia.  The applied-for warrant would

authorize the forensic examination of the Device for the purpose of identifying electronically

stored data particularly described in Attachment B.

## Factual Basis Supporting Probable Cause

A.    General Overview of the Investigation

6.     The Federal Bureau of Investigation and local law enforcement agencies have

been investigating a series of armed robberies of commercial establishments from November 1,

2016, to April 12, 2017.  During this time period, at least thirteen commercial establishments in

the Eastern District of Virginia and six commercial establishments in the District of Maryland

have been robbed at gunpoint by two or three black men. During the robberies, one or two of the subjects have brandished a handgun. Investigators believe that all of these robberies are connected for various reasons, including the physical description of the armed robbers, the description of the firearms used, the *modus operandi*, and the articles of clothing and shoes worn by the robbers. In addition, the subjects are believed to have committed three armed carjackings. Two of the vehicles that were stolen were used as getaway vehicles for several of the robberies.

7.     Investigators believe that Anton Durrell Harris ("Harris"), Lamont Kortez Gaines ("Gaines"), Andrew Bernard Duncan ("Duncan"), and Desmar Rashad Gayles ("Gayles") participated in some, if not all, of the armed robberies described herein.

8.     Duncan was arrested on March 29, 2017, in Washington, D.C. At the time of his arrest, Duncan was wearing a distinctive Nike sweatshirt that appears identical to a sweatshirt worn by one of the robbers during many of the armed robberies. In addition, Duncan has posted on his Facebook page photographs of himself wearing two different jackets that appear identical to jackets worn by one of the subjects during many of the armed robberies. One of the jackets is a distinctive dark blue Helly Hansen jacket with two white H's in the back, white rectangular strips on the shoulders, a white logo on the front right breast, and a white zipper in the front. The other jacket is a dark-colored parka with a fur-lined hood.

9.     As for Gayles, in a photograph posted by Duncan on his Facebook page on March 19, 2017, Gayles is wearing a pair of black pants with the Helly Hansen logo ("HH") above his right knee and tan boots that are extremely similar, if not identical, to pants and boots worn by one of the robbers during some of the armed robberies. In addition, on March 18, 2017, a surveillance camera at a market near Gayles' residence in Washington, D.C., captured a man who appears to be Gayles wearing the black Helly Hansen pants as well as a gray hooded coat

that bears a striking resemblance to the gray hooded coat worn by one of the suspects in several of the armed robberies.

10.     On April 11, 2017, the Honorable Theresa Carroll Buchanan, United States Magistrate Judge in the Eastern District of Virginia, issued a criminal complaint charging Duncan and Gayles with using, carrying, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).  Law enforcement executed the arrest warrant on Gayles at approximately 11:30 a.m. on April 13, 2017.

11.     Shortly before Gayles was arrested, law enforcement officers observed Harris, Gaines, and Gayles exiting the residence located at 204 Newcomb Street, S.E., Washington, D.C. Officers began conducting surveillance of that particular location hours before they observed the three men exiting the residence.  At approximately 7:35 a.m. on April 13, 2017, officers observed Gaines exit 204 Newcomb Street, S.E., Washington, D.C., walk to a wooded area, and retrieve a black bag that the officers could see contained cartons of Newport cigarettes.  Officers then observed Gaines carry the bag towards the residence and walk by a blue 1998 Chevrolet Monte Carlo with the bag and then outside the view of law enforcement.  When Gaines reappeared, he was no longer carrying the bag.

12.     At approximately 9:56 a.m., surveillance officers saw Harris exit 204 Newcomb Street, S.E., Washington, D.C. and enter the Monte Carlo.  Officers then observed Harris drive the Monte Carlo down the street and park it several houses away from 204 Newcomb Street, S.E., Washington, D.C.  Surveillance officers also saw Gayles at the doorway of the residence. Shortly thereafter, officers observed Harris enter 204 Newcomb Street, S.E., Washington, D.C.

13.     At approximately 11:30 a.m., surveillance officers observed Gaines, Harris, and Gayles exit 204 Newcomb Street, S.E., Washington, D.C., and enter the Monte Carlo.  Law

enforcement officers then conducted a traffic stop to effectuate Gayles' arrest. Arresting officers

observed in the backseat of the Monte Carlo, and in plain view, the black bag that Gaines had

earlier retrieved from the wooded area. The bag was open and Newport cigarette cartons could

be seen inside the open bag. Also in plain view were black trash bags that contained more

cartons of cigarettes. The presence of numerous cartons of Newport cigarettes was significant to

law enforcement because 35 cartons of Newport cigarettes had been taken during an armed

robbery of the 7-Eleven located at 4970 Columbia Pike, Arlington, Virginia, at approximately

11:45 p.m. on April 12, 2017. The two masked men who robbed the 7-Eleven at gunpoint fit the

physical description of Gaines and Harris. Gaines and Harris were also arrested and both were

charged later that same day in the Eastern District of Virginia of using, carrying, and brandishing

a firearm during and in relation to a crime of violence, namely, the April 12, 2017 armed robbery

of the Columbia Pike 7-Eleven.

14.     Gayles, Gaines, and Harris were all searched incident to arrest. The Device was

one of two mobile phones found on Gaines' person and seized by law enforcement. The Device

is currently in the FBI's custody in an evidence locker located at 9325 Discovery Boulevard, in

Manassas, Virginia, 20109, within the Eastern District of Virginia.

B.     The Armed Robberies of Commercial Establishments and the Armed Carjackings

15.     On November 1, 2016, at approximately 12:41 a.m., Fairfax County police

officers responded to a report of an armed robbery at the 7-Eleven located at 2305 Huntington

Avenue in Alexandria, Virginia, within the Eastern District of Virginia. Witnesses at the scene

reported that three black men had robbed the 7-Eleven shortly before the police arrived. One

employee stated that all three men were wearing dark-colored jackets or sweatshirts with hoods

over their heads and what appeared to be ski masks. The employee further reported that one of

the men brandished a silver handgun and forced her to the ground. The employee stated that one

of the robbers demanded that the employee "open the safe" and said "hurry up or I'll shoot you"

and "give me the money." A second employee stated that he believed another robber also had a

firearm and that he and a customer were forced to the ground. Surveillance footage confirms the

witnesses' accounts and captures the three men entering the store, forcing the employees and

customer onto the ground, and taking cash from the registers as well as cigarettes from a display

on the back wall. On the surveillance video, one of the robbers is seen wearing a distinctive dark

blue Helly Hansen jacket with two white H's in the back, white rectangular strips on the

shoulders, a white logo on the front right breast, and a white zipper in the front. The video

surveillance footage from outside the 7-Eleven shows the three robbers fleeing in what appears

to be a light-colored Dodge minivan.

16.    On November 16, 2016, at approximately 11:31 p.m., police officers with the

Alexandria Police Department responded to a report of an armed robbery at the 7-Eleven located

at 800 Franklin Street in Alexandria, Virginia. Witnesses at the scene reported that two black

men dressed in black hooded jackets, black pants, and black masks entered the 7-Eleven and

robbed the store at gunpoint. One of the employees reported that he was pulled into the back

office by one of the robbers, who demanded money and ransacked the desk drawers. That robber

then took the employee to the front counter area and ordered the employee to hold plastic bags

open while the robber placed cartons of Newport cigarettes inside the plastic bags. Another

employee reported that a second robber approached him from behind and placed a silver

handgun with a brown handle against the employee's side and demanded money. The employee

complied and opened the two cash registers for the gunman. The surveillance video confirms the

witnesses' accounts and shows the gunman pointing a large silver revolver-style handgun at one

6

of the employees, who opens the cash register and hands money to the gunman while on his

knees. The surveillance video also shows that the gunman wore a black or dark gray hooded

coat and black pants with a white marking above the right knee. The other robber wore

distinctive black and gray gloves and a dark-colored hooded sweatshirt with Nike's logo, a large

gray or white swoosh, on the front.

17.     On November 22, 2016, at approximately 9:37 p.m., police officers with the

Alexandria Police Department responded to a report of an armed robbery at the 7-Eleven located

at 3023 Duke Street in Alexandria, Virginia. An employee at the scene reported that while he

was behind the counter, two men entered the store very quickly and one approached him

brandishing a firearm. The other man went into the back area of the store. The employee further

reported that the gunman ordered him to the ground, forced him towards one of two cash

registers, and ordered him to open the cash registers. The employee opened one of the cash

registers and the gunman took money from it. The gunman then forced the employee to open the

second register and removed money from that register as well. The employee further reported

that after taking money from the cash registers, the armed robber again pointed the gun at the

employee, forced the employee to the ground, and told the employee to remain quiet and stay

down. The gunman then grabbed five cartons of Newport cigarettes from a nearby stool before

fleeing the store on foot with the second robber. The employee saw the second robber leave with

a full trash bag, which he later determined contained numerous additional cartons of Newport

cigarettes.

18.     The video surveillance footage confirms the witness' account. As can be seen on

the video recording, the gunman wore a dark gray hooded coat and black pants with a white

marking above the right knee just like the gunman at the November 16, 2016 robbery of the

Franklin Street 7-Eleven. The video footage shows that the other robber wore black and gray gloves and a dark-colored hooded sweatshirt with Nike's large swoosh on the front just like the second subject who robbed the Franklin Street 7-Eleven on November 16, 2016.

19.     On December 6, 2016, at approximately 10:35 p.m., Prince George's County Police responded to the report of an armed robbery of the Dash In located at 11001 Livingston Road in Fort Washington, Maryland. Employees at the scene reported that a man entered the store brandishing a black handgun and another man entered right behind him. The gunman wore a black coat, a gray hoodie, and black pants while the other man wore a dark blue jacket, a dark hoodie, and black pants. The employees reported that the two men ordered the employees to open the cash registers and they complied. The two men emptied out the cash registers and grabbed a handful of Newport cigarettes before fleeing the scene.

20.     On December 7, 2016, at approximately 12:03 a.m., police officers with the Alexandria Police Department responded to a report of an armed robbery of the 7-Eleven located at 2002 Eisenhower Avenue in Alexandria, Virginia. An employee reported that he was stocking shelves when two men entered the store, ran up to him, and grabbed him. According to the employee, one of the men displayed a black handgun while the other led him back behind the counter. The employee reported that one of the men ordered him to open the cash register and then told him to get down on the ground. The two men took money from the register before leaving. The video surveillance footage confirms the witness' account as well as his description of the robbers. The footage also shows the robbers taking cigarettes from the wall display behind the counter. As can be seen on the surveillance video, one of the robbers wore a black jacket over a gray hooded sweatshirt with the hood up. The other robber wore what appears to

8

be the very same dark blue Helly Hansen jacket worn by one of the men who robbed the
Huntington Avenue 7-Eleven on November 1, 2016.

21.     On December 13, 2016, at approximately 10:04 p.m., police officers with the
Alexandria Police Department responded to a call of an armed robbery of the 7-Eleven located at
30 South Reynolds Street in Alexandria, Virginia. Witnesses on the scene reported that two
black men wearing dark jackets, masks, and gloves entered the 7-Eleven brandishing firearms.
An employee reported that one robber, who wore a gray hooded sweatshirt under his dark jacket,
approached him, pointed the firearm at him, and ordered him to give the robbers money. The
gray hooded robber forced the employee towards a register, ordered the employee to open it, and
then took cash from it. According to the employee, when he was slow to open the second
register, the gray hooded robber said to him, "open, open, I'm going to shoot you, open!" The
employee complied and the robber took cash from that register as well. Another employee
reported that both robbers were displaying firearms and that both grabbed money from the
registers.

22.     The video surveillance footage confirms the witnesses' accounts and shows that
one robber wore a black jacket over a gray hooded sweatshirt with the hood up and dark pants
while the other robber wore dark jeans and a blue Helly Hansen jacket over a black Nike
sweatshirt with a large swoosh. Witnesses also saw the robbers flee in a vehicle that was parked
nearby. A delivery truck driver saw the two robbers run out of the 7-Eleven to a parking lot
behind the store and enter what the witness believed was a silver Dodge Dart.

23.     Later that same night, about an hour after the armed robbery at the Reynolds
Street 7-Eleven, police officers with the Bladensburg Police Department responded to a report of
an armed robbery of a 7-Eleven located at 5456 Annapolis Road in Bladensburg, Maryland. The

store clerk reported that two black men had just robbed the store at gunpoint. According to the

clerk, the first man to enter the store had shoulder length dreads and wore a black ski mask and a

black jacket over a gray hooded sweatshirt with the hood over his head. The second subject,

who entered immediately after the first subject, wore a black jacket with the hood over his head.

The clerk reported that the first subject brandished a small black semi-automatic handgun and

ordered the clerk to open the cash drawers. While the first subject took cash from the drawers,

the second subject went into the back storage area and took four cartons of Newport cigarettes.

The video surveillance footage corroborates the witness' factual account and shows that one of

the robbers wore a black Nike hooded sweatshirt with a large light-colored swoosh on the front.

The other robber wore a black jacket over a gray hooded sweatshirt just like the gunman at the

Reynolds Street 7-Eleven robbery earlier that same night.

24.     On December 15, 2016, at approximately 8:44 p.m., police officers with the

Fairfax County Police Department responded to a call of an armed robbery of the Quality Inn

located at 7212 Richmond Highway in Alexandria, Virginia. Two employees working at the

hotel's front desk reported that they had just been robbed by two black men wearing face masks

and all black clothing. One employee reported that one subject entered the hotel's front door and

immediately jumped the counter at the front desk, while the other man pointed a firearm at her

coworker. The employee further reported that the subject who jumped behind the front desk

ordered her to open the register. She complied and the subject took about $400 from the register.

That subject then ran to the kitchen break room, which was locked, and tried to open the locked

door without success. He then returned to the front desk and jumped over the counter. That

subject and the gunman then ran out the front door. The other employee reported that one of the

robbers pointed a black revolver at her and told her to get back and not move. She further reported that the robber who jumped over the counter had dreads.

25. The video surveillance footage corroborates the witnesses' accounts of the robbery. As can be seen on the video, the robber who jumped over the counter wore a blue Helly Hansen jacket that appears to be the same jacket worn by one of the robbers during the November 1, 2016 Huntington Avenue 7-Eleven robbery and the December 7, 2016 Eisenhower Avenue 7-Eleven robbery. Specifically, the jacket has two white H's in the back, white rectangular strips on the shoulders, a white logo on the front right breast, and a white zipper in the front. The video of the Quality Inn robbery shows that the other robber wore a black jacket over a white or gray hooded sweatshirt with the hood up.

26. Surveillance video also captures a silver sedan parked in front of the hotel multiple times prior to the robbery. Shortly before the robbery, a silver sedan that looks like the same vehicle can be seen driving past the Quality Inn and parking down the road from the hotel. The video also captures the two robbers emerging from the dark from where the silver sedan had been (or was) parked. After the robbery, the two robbers ran back to where the silver sedan had been (or was) parked, a car's brake lights went on, and then the car drove away.

27. The surveillance footage from the Quality Inn further captures a black man with long dreads entering the lobby of the hotel in the hour before the robbery, speaking to the employees at the front desk, exiting the hotel, and then entering the same silver sedan. The man wore a dark gray coat and pants that were very similar, if not identical, to those worn by one of the robbers in some of the robberies described above. It is believed that this individual was casing the Quality Inn before the robbery.

11

28.     On December 22, 2016, at approximately 11:01 p.m., police officers from the Prince George's County Police Department responded to a report of an armed robbery of the 7-Eleven located at 4921 Edgewood Road in College Park, Maryland.  Two employees reported that three black men wearing ski masks had just robbed the 7-Eleven.  According to the witnesses, one of the robbers brandished a black handgun while another robber jumped the front counter, demanded money from the register and safe, and took money from the register as well as cigarettes.  One of the witnesses reported that the gunman escorted her to the back of the store and that she told the gunman she did not know the password to the safe.  The three robbers fled soon thereafter.  As can be seen on surveillance images, one of the robbers wore a blue jacket that appears to be the very same blue Helly Hansen jacket worn by one of the robbers during previous robberies.

29.     In March 2017, another string of armed robberies occurred in the Washington, D.C. Metropolitan area and the perpetrators are believed to be the same individuals who committed the robberies described above.  Not only has the *modus operandi* been similar (*i.e.*, the armed robbery of convenience stores and hotels by two or more subjects, the taking of Newport cigarettes as well as cash from registers), but also some of the perpetrators of the recent robberies have worn what appear to be the same articles of clothing worn by the subjects who committed the November and December robberies.

30.     On March 16, 2017, at approximately 10:51 p.m., Prince George's County Police responded to a report of an armed robbery at the Dash In convenience store located at 11001 Livingston Road in Fort Washington, Maryland.  According to the witnesses, two men wearing black masks and hooded jackets robbed the store and a witness at gunpoint.  The witnesses reported that one of the subjects brandished a black machine-style pistol while the other subject

demanded money and cigarettes. The subjects stole $133.90 in cash, approximately 10-15 packs of Newport Cigarettes, and one wallet containing a driver's license, credit cards, and miscellaneous papers. The surveillance video of the robbery captures one of the robbers carrying a large semi-automatic handgun in a white sling. The surveillance video also captures the other robber wearing a distinctive dark-colored jacket with a fur-lined hood.

31.     On March 18, 2017, at approximately 7:41 p.m., officers with the Alexandria Police Department responded to a report of a carjacking at 501 Slaters Lane, in Alexandria, Virginia. At the scene, the victim reported that minutes earlier he was robbed of his vehicle, a 2010 Nissan Altima, at gunpoint. The victim stated that he had parked his vehicle in the parking lot of the apartment building located at 501 Slaters Lane and was in the process of unloading items from his vehicle. According to the victim, while standing inside the rear door of the apartment building, he noticed a black man near his vehicle. The victim reported that upon walking outside of the building to get a closer look at the man, another black man approached him and brandished a black handgun. The gunman then told the victim to put his hands up and then both black men went through his pockets, removing the keys to his vehicle, $180 in cash, and his mobile phone. The victim further reported that the two black men ran to his Nissan Altima, entered it, and sped away.

32.     The stolen Nissan Altima was recovered six days later at 620 Mellon Street, S.E., in Washington, D.C., which is near known residences for Gayles and Duncan. Investigators acquired video footage from a nearby business that captures two black men exiting the Nissan Altima at approximately 7:54 p.m. on March 18, 2017, the same night the vehicle was stolen. Surveillance video also captures two other men arriving in a separate vehicle and parking near the Nissan Altima. One of these two men bears a striking resemblance to Duncan. The

surveillance video also captures three of the four men entering a nearby market. Investigators also obtained surveillance video from the nearby market. That footage shows that at approximately 7:56 p.m. on March 18, 2017, the two men who exited the Nissan Altima entered the market. One of the men strongly resembles Gayles and can be seen wearing a dark gray hooded coat and black pants with a white logo above the knee that are strikingly similar, if not identical, to the dark gray hooded coat and black pants worn by one of the robbers during the November 16, 2016 robbery of the Franklin Street 7-Eleven and the November 22, 2016 robbery of the Duke Street 7-Eleven. The other man who was seen exiting the Nissan Altima strongly resembles Gaines. The third individual who entered the market was one of the men who exited the vehicle that parked next to the stolen Nissan Altima. That individual bears a striking resemblance to Harris.

33.     Also on March 18, 2017, at approximately 11:23 p.m., Prince George's County Police responded to a report of an armed carjacking at 4427 23rd Parkway, Temple Hills, Maryland. The victims reported that shortly after parking their vehicle, two black men wearing black ski masks approached them and one brandished a dark gray semi-automatic handgun. One of the masked men took the car keys from one of the victims and then both men jumped in the vehicle and sped away. The vehicle stolen during the carjacking was a gray or silver 2014 Nissan Versa with Maryland temporary tag "T122666." One victim reported that the gunman wore a grayish black puffy coat with fur on the hood.

34.     In the early morning hours of March 19, 2017, less than ninety minutes after the armed carjacking in Temple Hills, Maryland, Arlington Police Officers responded to the report of an armed robbery at the Shell Gas Station located at 4060 South Four Mile Run Drive in Arlington, Virginia. The store clerk reported that three black men wearing hooded jackets and

14

black masks had robbed the station at gunpoint. The clerk further reported that the robbers took approximately $400 from a cash register and approximately $100.00 from a customer. According to the clerk, the gunman asked where the cigarette cartons were kept and the clerk advised that the store did not have any cartons of cigarettes. The gunman then touched some cigarette packs on the display case but did not take any of them.

35.     The store's surveillance footage confirms the witness' account and captures the three men entering the store and one of them brandishing what appears to be a Tec-9 semi-automatic handgun with an extended magazine. The gunman carried the firearm in a white sling draped around his neck and chest. The first robber to enter the store wore a dark-colored jacket with a fur-lined hood just like the one worn by one of the subjects who robbed the Livingston Road Dash In on March 16, 2017. The surveillance footage also captures the three men fleeing in a vehicle matching the description of the Nissan Versa stolen during the Temple Hills carjacking that had taken place earlier that same night. The getaway vehicle appeared to be driven by a fourth subject as the brake lights and the rear wiper were on while the three robbers were inside the store and, immediately following the robbery, one robber entered the front passenger side and the other two entered the rear passenger side of the vehicle.

36.     On March 19, 2017, at approximately 9:12 p.m., Fairfax County Police Officers responded to a report of an armed robbery at the Red Roof Inn located at 5975 Richmond Highway in Alexandria, Virginia. The hotel clerk reported that three black men wearing black ski masks robbed the hotel at gunpoint. According to the clerk, two of the men brandished firearms and all three proceeded behind the counter and took approximately $100 from the drawers located at the center of the counter. The robbers then attempted to have the clerk open the safe located behind the counter, but were unsuccessful as the clerk informed them that the

safe had a time delay and would not open for ten minutes. At this time, one of the robbers struck the clerk in the face. The three subjects then entered the office located to the rear of the front counter and stole approximately $2,000 to $2,500 in cash from a desk drawer.

37.     The surveillance footage confirms the clerk's account and captures one robber holding in a white sling what appears to be a Tec-9 semi-automatic handgun with an extended magazine. Surveillance footage also captures this same robber wearing a dark gray hooded coat similar, if not identical, to the coat worn by Gayles on March 18, 2017, and by one of the robbers during the November 16, 2016 robbery of the Franklin Street 7-Eleven and the November 22, 2016 robbery of the Duke Street 7-Eleven. The surveillance video of the Red Roof Inn robbery also shows that one of the robbers wore a dark Nike hooded sweatshirt with a large light-colored swoosh on the front, just like the one worn by one of the robbers during the November 16, 2016 robbery of the Franklin Street 7-Eleven, the November 22, 2016 robbery of the Duke Street 7-Eleven, the December 13, 2016 robbery of the Reynolds Street 7-Eleven, and the December 13, 2016 robbery of the Annapolis Road 7-Eleven. The robber who wore the dark Nike sweatshirt also brandished a black handgun at the clerk.

38.     Later that same night, a little over an hour after the Red Roof robbery, Alexandria Police Officers responded to a report of an armed robbery at the Domino's Pizza located at 5418 Duke Street in Alexandria, Virginia. Witnesses reported that three black men wearing black masks robbed the store at gunpoint. The surveillance footage captures one of the masked men holding what appears to be a Tec-9 semi-automatic handgun with an extended magazine while another subject removed cash from a register. The surveillance footage also shows that all three subjects are wearing clothing similar to that worn by the men who robbed the Red Roof Inn earlier that same night, including the dark Nike hooded sweatshirt with a large light-colored

swoosh on the front. The surveillance footage also captures the gunman wearing a dark gray hooded coat and black pants with a white marking above the right knee similar, if not identical, to clothing seen on one of the robbers in prior robberies. An alley camera captures all three subjects entering a silver 4-door hatchback with a temporary tag beginning with "T1." The vehicle strongly resembles the Nissan Versa that was stolen during the carjacking on March 18, 2017, in Temple Hills, Maryland.

39.     On March 21, 2017, at approximately 6:17 p.m., Prince George's County Police officers responded to a report of an armed robbery at the GameStop located at 5706 Silver Hill Road, District Heights, Maryland. Witnesses reported that three black men wearing black masks entered the store and one brandished a firearm. The description of the firearm is consistent with a Tec-9 semi-automatic handgun. According to the witnesses, the three masked men demanded money and took $900.00 in cash from a register. The witnesses further reported that the robbers forced the witnesses to the rear of the store at gunpoint. After doing so, the three masked men stole two PlayStation 4 Systems, three Xbox One Consoles, and numerous video games. Surveillance footage confirms the witnesses' accounts. As can be seen on the video, one of the robbers wore a dark Nike hooded sweatshirt with a large light-colored swoosh on the front.

40.     On March 26, 2017, Metropolitan Police Officers reported to 941 Shepherd Street in response to a report of an armed carjacking. At the scene, the victim reported that at approximately 1:15 a.m., three black men wearing black clothing and black masks approached him as he was exiting his vehicle, a red 2015 Mazda MX3. According to the victim, one of the men brandished a black handgun and ordered the victim to relinquish his car keys. In addition to taking the victim's keys, the three men removed from the victim's pockets his mobile phone and wallet, which contained cash and credit cards. The gunman entered the driver's seat of the

17

Mazda and the other two subjects jumped into the front passenger seat and the back seat. The three men then fled in the stolen vehicle.

41.     At approximately 2:40 a.m. that same night, officers with the Alexandria Police Department responded to a report of an armed robbery at the 7-Eleven located at 800 Franklin Street in Alexandria, Virginia. At the scene, a store clerk reported that at around 2:30 a.m., two black men wearing black masks robbed the 7-Eleven at gunpoint. According to the store clerk, one of the men brandished a handgun and ordered that the store clerk open the register while the other subject walked straight to the storage room. The store clerk complied by unlocking both registers and the gunman removed cash from the registers. The gunman also ordered the store clerk to provide him with a bag. The store clerk further reported that he and the gunman walked to the storage room to get a black garbage bag. Upon entering the storage room, the store clerk saw the other subject rummaging through drawers. Before exiting the 7-Eleven, the gunman placed approximately eleven cartons of Newport Methol in the black garbage bag. Both subjects then fled the store with approximately $250 in cash and the cartons of cigarettes. They jumped into an awaiting dark sedan and fled the area, which matched the description of the red 2015 Mazda MX3 that had been stolen during the carjacking earlier that same night. The store clerk advised that the gunman had braids or dreadlocks and wore a gray jacket and that the other robber wore a black Nike sweater with a white swoosh on the chest.

42.     The surveillance footage corroborated the witness' account of the robbery. The footage also captures one robber brandishing what appears to be a black handgun. In the video, the gunman is wearing a gray hooded jacket and black pants with a white marking above the knee. Such clothing is strikingly similar, if not identical, to the clothing worn by one of the robbers in some of the robberies described above as well as by the man, believed to be Gayles,

18

who exited the stolen Nissan Altima and entered a nearby market on March 18, 2017. The surveillance video of the March 26, 2017 robbery of the Franklin Street 7-11 also captures the other robber wearing a dark hooded sweatshirt with a large Nike swoosh on the front and purple gloves.

43.     Approximately 90 minutes after the Franklin Street 7-Eleven was robbed, Prince George's County police officers responded to a report of an armed robbery at the 7-Eleven located at 8905 Rhode Island Avenue in College Park, Maryland. A witness at the scene reported that at approximately 4:00 a.m., two black men wearing black ski masks and dark hooded clothing robbed the store at gunpoint. According to the witness, one of the men had long dreads and brandished a black semi-automatic handgun. The witness further reported that the other robber wore a black hoodie with a gray Nike swoosh on the front. Surveillance cameras captured the robbery and the footage corroborates the witness' account. The footage shows that the gunman wore a gray hooded coat and that the other robber wore a dark hooded sweatshirt with a large Nike swoosh and purple gloves. Surveillance footage also shows the two men running to and jumping into the passenger side of an awaiting red four-door sedan, which matches the description of the 2015 Mazda MX3 that was stolen during the carjacking that occurred earlier that same night.

44.     On March 29, 2017, at approximately 5:42 p.m., Fairfax County police officers responded to a report of a robbery at the Advance America Cash Advance store located at 7289 Commerce Street in Springfield, Virginia. At the scene, a store clerk reported that two men wearing hooded clothing and masks ran into the store, jumped the counter, and yelled "open up" and "where's the safe." The clerk told officers that she put her hands in the air and told the two men that she did not have a safe. The two men ordered the clerk to open the cash drawers and

the clerk complied. The two men then left with $3,650 in cash that belonged to the Advance America Cash Advance store. The clerk advised that she did not see any weapon or hear any reference to a weapon. The surveillance footage corroborates the store clerk's account and also shows that one of the robbers wore a dark hooded sweatshirt with a large light-colored Nike swoosh on the front.

45.     As will be discussed in more detail below, Andrew Duncan was arrested within hours of the America Advance Cash Advance store. At the time of his arrest, he was wearing a dark hooded sweatshirt with a large light-colored Nike swoosh on the front. He was also found in possession of $3,659 in cash.

46.     On April 6, 2017, the America Advance Cash Advance store located at 6244 Little River Turnpike in Fairfax County was robbed at gunpoint. Two men wearing black ski masks entered the store and one of the men brandished a firearm. The firearm appeared to be a Tec-9 semi-automatic handgun and the gunman carried it on a white sling. Before exiting the store, one of the men yelled words to the effect that the robbery was committed "for [his] cousin."

47.     On April 12, 2017, at approximately 11:53 p.m., Arlington County Police Officers responded to a report of an armed robbery at the 7-Eleven located at 4970 Columbia Pike in Arlington, Virginia, within the Eastern District of Virginia. Surveillance footage captures two men wearing black ski masks and black hooded sweatshirts. The surveillance footage further captures one of the men brandishing what appears to be a Tec-9 semi-automatic handgun with an extended magazine. During the robbery, the two men took 35 cartons of Newport cigarettes and approximately $200 belonging to the 7-Eleven.

48.     All the business establishments described above were engaged in commercial activity and the robbery of each establishment affected interstate commerce.

C.     Initial Identification of Other Suspects

49.     Until March 29, 2017, based in large part on information provided by a person (hereinafter referred to as "the Tipster") who called the FBI Public Access Line on January 17, 2017, FBI agents working on the investigation of the string of robberies had identified as possible suspects three individuals who do not appear to be acquainted with Gayles or Duncan. The caller, who hereinafter will be referred to as "the Tipster," contacted the FBI Public Access Line after the FBI issued a press release containing still images of the robbers from several of the surveillance videos of the November and December 2016 robberies. The press release also contained a link to a YouTube posting of a compilation of surveillance video clips from the December 15, 2016 Quality Inn robbery. During his January 17, 2017 call to the FBI, the Tipster identified two men who he believed could be responsible for the string of robberies in November and December 2016. The Tipster identified both men by name and they will hereinafter be referred to by their initials, NF and ST.

50.     The Tipster reported that NF was his friend and that ST was NF's friend. According to the Tipster, NF frequently stayed at the Tipster's residence on weekends and ST often accompanied NF to the Tipster's home. The Tipster stated that the previous week (mid-January 2017), he had found two face masks in his home and he believed they belonged to NF. The Tipster further stated that after looking at the still images and video of the robberies that were posted online by the FBI, he believed that NF and ST were responsible for the series of armed robberies. The Tipster also reported on January 17, 2017, that ST always wears a Nike sweatshirt and a face mask that he rolls up and wears as a hat.

21

51.     On February 5, 2017, NF was arrested in Prince William County on charges of forging and uttering. He has remained in state custody pending trial on those charges ever since then. As a result, NF has never been a suspect in connection with the March 2017 robberies.

52.     On February 15, 2017, the government obtained two court orders requiring service providers to provide historical cell-site data for mobile phones the government had reason to believe belonged to NF and ST. The requested records were for the period October 12, 2016, to January 11, 2017. The cell-site records for ST's mobile phone showed that the phone activated cell-sites within ten miles of the following locations within half an hour of the robbery: the Huntington Avenue 7-Eleven (November 1, 2016) and the Duke Street 7-Eleven (November 22, 2016). For the remaining robberies, ST's mobile phone did not activate any cell-site towers within a half hour of the robbery so the phone's proximity to the robbery locations around the times of the robbery could not be determined.

53.     The cell-site records for NF's mobile phone, which became active on November 8, 2016, show that NF's phone only once activated a cell-site near a robbery location. Specifically, on November 22, 2016, NF's phone activated a cell-site within ten miles of the Duke Street 7-Eleven within an hour of that robbery. The cell-site records further reflect that NF's mobile phone activated cell-site towers far from the following robbery locations within an hour of the robberies: Livingston Road Dash In (December 6, 2016); Eisenhower Avenue 7-Eleven (December 7, 2016); South Reynolds Street 7-Eleven (December 13, 2016); Richmond Highway Quality Inn (December 15, 2016); and Edgewood Road 7-Eleven (December 22, 2016). Consequently, the cell-site records for NF's mobile phone did not corroborate the Tipster's belief that NF was involved in the November and December 2016 robberies.

54.     On March 21, 2017, the Tipster identified another individual (hereinafter "JC"), whom he believed might have been involved in the string of robberies. On that date, the Tipster reviewed surveillance stills from some of the robberies committed in November and December 2016. The Tipster stated that some of the individuals in the stills resembled NF, ST, and JC. The Tipster stated that he recognized as his a pair of sweatpants and a gray hooded sweatshirt worn by one of the robbers in some of the November and December robberies. The Tipster also added that he believed ST was one of the robbers because ST wears a Nike sweatshirt and rolls up his pant legs as did one of the robbers in the surveillance stills. With respect to JC, the Tipster reported that on the evening of March 18, 2017, he observed an acquaintance of JC showing JC a .22 caliber pistol before JC and his acquaintance left thej Tipster's home. Officers working on this investigation have not found any evidence to corroborate the Tipster's claim that ST wears a Nike sweatshirt and rolls up his pant legs or that on March 18, 2017, JC was with a man who was in possession of a .22 caliber pistol.

D.      Evidence Linking Gayles, Duncan, Harris, and Gaines to the String of Robberies

55.     At approximately 7:35 p.m. on March 29, 2017, less than two hours after the robbery of the Advance America Cash Advance store in Springfield, MPD officers observed Duncan dispose of a black and silver handgun. Shortly thereafter, Duncan was arrested and charged with unlawful possession of a firearm. At the time of his arrest, Duncan was wearing a dark-colored hooded sweatshirt with a large, light-colored Nike swoosh logo on the front. In addition, during a search incident to his arrest, Duncan was found in possession of $3,659 in cash, just $9 more than what was stolen from the Advance America Cash Advance store earlier that evening.

56.     Law enforcement have also discovered photographs of Duncan wearing other articles of clothing that appear to be the same as those worn by one of the robbers. Based on postings made by the user, investigators have reason to believe that Duncan uses the Facebook username "Bissle Missmydawg Gadget." On November 17, 2016, the user of that account posted a photograph of Duncan wearing a jacket that bears a striking resemblance to the distinctive dark blue Helly Hansen jacket that one of the robbers wore during the November 1, 2016 robbery of the Huntington Avenue 7-Eleven, the December 6, 2016 robbery of the Livingston Road Dash In, the December 7, 2016 robbery of the Eisenhower Avenue 7-Eleven, and the December 22, 2016 robbery of the Edgewood Road 7-Eleven. Moreover, on March 19, 2017, the same day of the early morning robbery of the Four Mile Run Shell Gas Station, the user of the "Bissle Missmydawg Gadget" account posted images of four African American men posing on a sidewalk, one of whom is flashing numerous bills of unknown denomination. Two of the four men are Duncan and Gayles. In the images, Duncan is wearing a dark-colored parka with a fur-lined hood that appears to be the very same coat worn by one of the robbers during the March 19, 2017 robbery of the Four Mile Run Shell Gas Station as well as the March 16, 2017 robbery of the Livingston Road Dash In.

57.     The images posted on the Bissle Missmydawg Gadget page on March 19, 2017, also constitute circumstantial evidence of Gayles' participation in the robbery spree. In the posted images, Gayles is wearing black pants with a small white Helly Hansen logo above the right knee and tan boots. Both the pants and the boots bear a striking resemblance to items worn by one of the robbers during some of the robberies described above. In addition, Gayles has dreads in the posted images, and some of the robbery victims reported that one of the robbers had dreads.

58.     As previously stated, on March 18, 2017, surveillance cameras in Washington,

D.C., captured two men who strongly resemble Gayles and Gaines exiting a stolen Nissan

Altima and entering a nearby market. A man who strongly resembles Harris was also captured

on the market's surveillance cameras following the two men resembling Gayles and Gaines. On

that surveillance footage, the man believed to be Gayles is wearing what appears to be the very

same gray hooded coat worn by one of the robbers during many of the robberies.

59.     In addition, cell-site tower records indicate that Gayles was near some of the

robbery locations around the time of the robberies. Local law enforcement officers investigating

robberies in their jurisdictions obtained court orders requiring service providers with cellular

telephone towers ("cell towers") near some of the robbery locations to disclose certain records

and information associated with the cell towers. The requested records and information included

the telephone call number and unique identifiers for each wireless device in the vicinity of the

cell towers that registered with a tower near a robbery location around the time of the robbery.

Upon reviewing the information provided by the service providers, which information is

commonly referred to as "tower dumps," investigators determined that the phone assigned the

telephone number (202) 749-9443 activated towers near the following commercial

establishments within ten minutes of the robbery at that location:  the Dash In located at 11001

Livingston Road, Fort Washington, Maryland (December 6, 2016); and the 7-Eleven located at

5456 Annapolis Road, Bladensburg, Maryland (December 13, 2016). When, on March 16, 2017,

the Livingston Road Dash In was again robbed, the phone assigned the telephone number (202)

749-9443 activated a cell tower near that location within forty-five minutes of the robbery. In

addition, the records further reflect that the phone assigned the telephone number (202) 749-9443

activated a cellular tower servicing the area where the Nissan Versa was carjacked on March 18,

2017, within twenty minutes of the carjacking. According to a reliable public source database used by law enforcement, billing information associated with the (202) 749-9443 reflects Gayles as the owner or user of that mobile phone. Investigation has revealed that the phone assigned the telephone number (202) 749-9443 is a mobile phone serviced by Sprint Spectrum LP.

60.     On April 6, 2017, the Honorable John F. Anderson, United States Magistrate Judge, entered an order requiring Sprint Spectrum LP to disclose to the United States Attorney's Office and to the Federal Bureau of Investigation ("FBI") stored wire and electronic transactional records, including subscriber information, call-detail records, historical cell-site information or data, and per call measurement data (if available), related to the use of the cellular telephone assigned the number (202) 749-9443 for the period from October 12, 2016, to January 11, 2017, and the period from February 24, 2017, to March 30, 2017.

61.     On the afternoon of April 7, 2017, Sprint Spectrum LP disclosed stored wire and electronic transactional records in accordance with the Court's Order. The subscriber records reflect that the phone assigned the telephone number (202) 749-9443 is subscribed by Desmar Gayles. Those records further reflect that the phone assigned the telephone number (202) 749-9443 activated cell-site towers near each of the following robbery or carjacking locations within an hour of the crime:

> Dash In, 11001 Livingston Road, Fort Washington, Maryland (December 6, 2016)
> 7-Eleven, 5456 Annapolis Road, Bladensburg, Maryland (December 13, 2016)
> Quality Inn, 7212 Richmond Highway, Alexandria, Virginia (December 15, 2016)
> Dash In, 11001 Livingston Road, Fort Washington, Maryland (March 16, 2017)
> Nissan Altima carjacking, 501 Slaters Lane, Alexandria, Virginia (March 18, 2017)
> Nissan Versa carjacking, 4427 23rd Parkway, Temple Hills, Maryland (March 18, 2017)
> Mazda MX3 carjacking, 941 Shepherd Street, NW, Washington, D.C. (March 26, 2017)
> 7-Eleven, 800 Franklin Street, Alexandria, Virginia (March 26, 2017)
> 7-Eleven, 8905 Rhode Island Avenue, College Park, Maryland (March 26, 2017)

Indeed, for four of these six robberies and two of the three carjackings, the cell site records for the telephone number (202) 749-9443 show that the phone assigned that number activated a cell tower in close proximity to the robbery or carjacking location within ten minutes of the robbery. The cell-site records further indicate that Gayles was not near the Shell Gas Station located at 4060 South Four Mile Run Drive in Arlington, Virginia, around the time of the robbery on March 19, 2017. The cell-site records reflect that on that date, the phone assigned the telephone number (202) 749-9443 activated a cell-site tower far from the Four Mile Run Shell Gas Station around the time of the robbery. For the remaining robberies, however, the phone's location around the time of the robberies could not be determined based on the cell-site data produced by Sprint Spectrum LP on April 10, 2017.

62.     As for Harris and Gaines, each of their builds fits the physical description of at least one of the robbers who participated in some of the robberies described above. Moreover, the man who strongly resembles Gaines was observed exiting the stolen Nissan Altima with a man who strongly resembles Gayles on March 18, 2017. Soon after the men exited the stolen Nissan Altima, three men who appear to be Gayles, Gaines, and Harris were captured on surveillance cameras entering a market near the location where the men had parked the stolen Nissan Altima.

63.     Significantly, beginning on April 13, 2017, investigators found additional evidence linking Gaines and Harris to the string of robberies. On the morning of April 13, 2017, law enforcement officers were conducting surveillance of the home located at 204 Newcomb Street, S.E., Washington, D.C. in efforts to locate and apprehend Gayles, whose cell phone was activating cellular towers near that residence. At approximately 7:35 a.m. that morning, officers observed Gaines exiting 204 Newcomb Street, walking to a wooded area, and retrieving a black

bag that the officers could see contained cartons of Newport cigarettes. Officers then observed

Gaines carrying the bag towards the residence and walking by a blue 1998 Chevrolet Monte

Carlo with the bag and then outside the view of law enforcement. When Gaines reappeared, he

was no longer carrying the bag containing cartons of Newport cigarettes. Gaines' possession of

a bag containing cartons of Newport cigarettes was significant because less than 10 hours earlier,

two black men wearing ski masks had robbed at gunpoint the 7-Eleven located at 4970 Columbia

Pike in Arlington and had taken 35 cartons of Newport cigarettes and cash during the robbery.

64.     At approximately 9:56 a.m., surveillance officers saw Harris exit 204 Newcomb

Street, S.E., Washington, D.C. and enter the Monte Carlo. Officers then observed Harris drive

the Monte Carlo down the street and park it several houses away from the home located at 204

Newcomb Street. Surveillance officers also saw Gayles watching Harris from the doorway of

the residence. Shortly thereafter, officers observed Harris enter the residence located at 204

Newcomb Street, S.E., Washington, D.C.

65.     Then, at approximately 11:30 a.m. on April 13, 2017, surveillance officers

observed Gaines, Harris, and Gayles exit the residence located at 204 Newcomb Street and enter

the Monte Carlo. Law enforcement officers conducted a traffic stop to effectuate Gayles' arrest.

During the stop and subsequent arrest, officers could see in plain view in the back seat of the

Monte Carlo cartons of Newport cigarettes that matched the description of those taken during the

April 12, 2017 armed robbery of the Columbia Pike 7-Eleven. Harris and Gaines fit the physical

description of the two masked men who robbed the Columbia Pike 7-Eleven on April 12, 2017,

as well as those who committed the robbery of the Advance America Cash Advance store on

April 6, 2017. Harris and Gaines were arrested immediately after the traffic stop. During a

search of Gaines incident to his arrest, officers located multiple packs of Newport cigarettes on

his person. The tax stamps affixed to those cigarette packs reflect numbers that correspond to the tax stamps affixed to cigarette packs stolen from the Columbia Pike 7-Eleven on April 12, 2017.

66.     On the afternoon of April 13, 2017, a United States Magistrate Judge in the Eastern District of Virginia issued a criminal complaint charging Harris and Gaines with using, carrying, and brandishing a firearm during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, that is, the April 12, 2017 interference with commerce by robbery of the 7-Eleven store located at 4970 Columbia Pike, in Arlington, Virginia, and possessing a firearm in furtherance of such a crime of violence.

67.     Also on April 13, 2017, a United States Magistrate Judge in the District of Columbia issued a warrant authorizing the search of the residence located at 204 Newcomb Street, S.E., Washington, D.C.  Law enforcement officers executed the warrant later that same evening.  During the search, officers recovered the following evidence:  an Intratec 9 mm semi-automatic handgun with an extended and loaded magazine and a white sling; two black ski masks and one black hood; 17 packs of Newport Green cigarettes and seven packs of Newport Gold cigarettes; clothing and a pair of boots that strongly resemble those worn by some of the robbers; and an Xbox One console bearing the same serial number as one of the Xbox consoles stolen during the District Height's GameStop robbery on March 21, 2017.

68.     On April 14, 2017, a United States Magistrate Judge in the District of Columbia issued a warrant authorizing the search of the Monte Carlo that Gayles, Gaines, and Harris occupied immediately prior to their arrest.  Law enforcement officers executed the warrant on April 17, 2017, and seized evidentiary items, including the following:  10 unopened cartons of Newport cigarettes; 20 packs of Newport cigarettes, some of which were inside two opened cartons; one black ski mask; and one pair of Helly Hansen pants, one pair of green pants, two

black jackets, one black coat, and six gloves, all of which strongly resembled articles of clothing worn by the robbery suspects. Law enforcement officers also seized a black LG Model LGMS345 mobile phone, which was recovered from the dashboard console of the vehicle.

69.     As previously stated, the Device was located on Gaines' person during a search incident to arrest. Mobile phones were also recovered during the searches incident to the arrest of Gayles and Harris.

### Evidence Likely to be Found During Search of the Device

70.     In my training and experience, I know that the Device is being maintained in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of law enforcement.

71.     Based on my training and experience, I know that individuals who conspire to commit robberies often use cellular telephones to communicate with one another orally and via text messages both before and after the crime. They also use their cellular telephones to coordinate and arrange their crimes and sometimes to photograph and/or video themselves and their fellow conspirators, the fruits of their crimes, and the instruments used in committing their crimes. Individuals who conspire to commit robberies also often store the contact information of their criminal associates in their cellular phones. I also know that such individuals often use their cellular phones as a GPS navigation device to map the directions to locations they intend to rob.

72.     Based on my training and experience, I use the following technical terms to convey the following meanings:

     a.     Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or

traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  IP Address:  An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.  Internet:  The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.  IMEI number:  The International Mobile Equipment Identity ("IMEI") is a unique number given to every single cellular device.  International Mobile Subscriber Identity ("IMSI") is a unique fifteen-digit code used to identify an individual user on a Global System for Mobile Communications network.

j.  MEID number:  A Mobile Equipment Identifier (MEID) is a unique number given to each cellular device utilizing CDMA (Code Division Multiple Access) technology for wireless service.

73.     Based on my training, experience, and research, I know that the smartphones have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, or PDA.  In my training and experience, examining data stored on electronic devices can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

74.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensic tools.

75.     There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

    d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

76.    <u>Forensic evidence</u>. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). For computers, virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

    b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

77.   <u>Nature of examination</u>.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

78.   <u>Manner of execution</u>.  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

### Conclusion

79.   Based upon the above information, I submit that probable cause exists to authorize the examination of the Device described in Attachment A in order to seize the items described in Attachment B.

Joseph Paul Rogers
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to me this _20th_ day April, 2017.

_____/s/_____ MA
Michael S. Nachmanoff
____United States Magistrate Judge____
The Honorable Michael S. Nachmanoff
United States Magistrate Judge

**ATTACHMENT A**

The property to be searched is the white Samsung Galaxy S6 mobile phone, bearing MEID number DEC 256691573501336212, hereinafter referred to as "the Device."  The Device is currently located at 9325 Discovery Boulevard, Manassas, Virginia, 20109.

**ATTACHMENT B**

1.      All information and records on the Device described in Attachment A that may be evidence of violations of 18 U.S.C. §§ 1951(a), 924(c), and 2 (robbery affecting interstate commerce, conspiracy to do the same, and using, carrying, and brandishing a firearm during and in relation to a crime of violence), including, but not limited to:

> communications or information reflecting the planning or execution of a robbery of a commercial establishment;
>
> photographs or videos of criminal associates;
>
> photographs or videos of cash;
>
> photographs or videos of firearms or other weapons;
>
> photographs or videos of masks and other clothing items worn during robberies, including dark pants with marking above right knee, dark-colored coat with fur-lined hood, gray hooded sweatshirts, blue Helly Hansen jacket, dark-colored hooded sweatshirt with Nike logo on front, and dark gray hooded jacket;
>
> internet searches of commercial establishments and/or their locations;
>
> record of use of mapping applications for directions to robbery locations;
>
> address/phone books or contact information that reflect names of potential criminal associates;
>
> call logs;
>
> bills and invoices, including purchases of materials that are likely used to commit a robbery affecting interstate commerce;
>
> records, photographs, videos, or communications relating to the purchase or possession of firearms;
>
> records of storage facilities owned or rented;
>
> safe deposit records; and
>
> cellular and landline telephone statements and records.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.     Records evidencing the use of the Internet Protocol addresses, including:

a.     records of Internet Protocol addresses used;

b.     records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4.     All GPS information on the subject phone.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form. Such records and information include the content of communications, text messages, voice mail messages, photographs, images, and video.